IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAHMAJHEI JOMIRYON CHRISTIAN-JONES,<br><br>*Defendant.* | Case No. 1:25-MJ-28<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Kevin S. Fleenor, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. This Affidavit is submitted in support of a Criminal Complaint for **KAHMAJHEI JOMIRYON CHRISTIAN-JONES ("CHRISTIAN-JONES")**. Based on the information set forth in this Affidavit, I submit there is probable cause to believe that on or about January 16, 2025, in the Eastern District of Virginia, **CHRISTIAN-JONES** knowingly used or carried a machinegun, namely a Glock 19, 9mm caliber pistol, equipped with a machinegun conversion device, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, possession with intent to distribute a controlled substance in violation of 18 U.S.C. § 841(a)(1), in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii).

**AGENT BACKGROUND**

2. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I have been employed as a Special Agent with the Virginia State Police ("VSP"), Bureau of Criminal Investigation, Drug Enforcement Section, based in Fairfax, Virginia, and have been since 2018. I am currently assigned to the Drug Enforcement

Administration ("DEA") High Intensity Drug Trafficking Areas Task Force (Group 10) located in Reston, Virginia, as a DEA Task Force Officer. I have been assigned to this unit since March 2019. I am responsible for the enforcement of the statutes of the Virginia Code pertaining to the possession and distribution of narcotics and controlled substances as well as federal drug trafficking laws under Title 21 of the United States Code. I have been employed by VSP since June 2011 as a State Trooper, a Narcotics Canine Handler, and a Special Agent in the Drug Enforcement Section.

3. Throughout my career, I have participated in investigations related to narcotics and organized crime related offenses resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, drug proceeds, weapons, and other evidence of criminal activity. Additionally, I have interviewed many individuals involved in organized crime and have obtained information from them regarding the structure, leadership, and methods of organized criminal groups. Through my training and experience, I am familiar with the methods used by organized criminal groups. I have received extensive training from various federal, state, and local agencies, including VSP, the Virginia Department of Criminal Justice, DEA, and the Federal Bureau of Investigation, among others.

4. During the course of my participation in investigations of organized crime, I have testified in trial, grand jury proceedings, and at preliminary hearings. During my employment with VSP and tenure with DEA, I have gained knowledge in the use of various investigative techniques, including the use of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and Grand Jury subpoenas, and the execution of search and arrest warrants. In

addition, I am familiar with the search, examination, and exploitation of data obtained from cellular phones, computers, and internet-service and communications providers, including social media, e-mail, and online/web-based messaging applications.

5. Throughout my law enforcement career, and as part of my participation in this investigation, I have spoken with, worked with, and gained knowledge from, numerous experienced federal, state, and local investigators regarding organized crime. In addition, I have had discussions with other law enforcement officers and cooperating individuals about gang investigations, violent crime, drug trafficking, and firearms trafficking.

6. The information contained in this Affidavit is based on my personal participation in the investigation of this case and information provided to me by other federal, state, and local law enforcement agents and officers, and other information and data gathered during the course of this investigation. This Affidavit contains only the information necessary to support probable cause and is submitted solely for the purpose of obtaining an Arrest Warrant. Accordingly, this Affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation.

## RELEVANT STATUTES

7. Under 18 U.S.C. § 924(c)(1)(A), it is unlawful for any person to use or carry a firearm during and in relation to any crime of violence or drug trafficking crime.

8. Under 21 U.S.C. § 841(a)(1), it is unlawful to possess with intent to distribute a controlled substance, for example, one such controlled substance is oxycodone, which is a Schedule II controlled substance.

9. Under 18 U.S.C. § 924(c)(1)(B)(ii), a violation of 18 U.S.C. § 924(c)(1)(A) in which a defendant uses, carries, or possesses a machinegun, as defined in 26 U.S.C. § 5845(b), is punishable by a mandatory minimum sentence of at least 30 years.

10. A "machinegun" is defined in 26 U.S.C. § 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."

## PROBABLE CAUSE

11. On or about January 16, 2025, at approximately 3:20 a.m., Prince William County Police Department officers were on routine patrol in and around Dale Blvd. and Forest Dale Ave. in Prince William County, Virginia, within the Eastern District of Virginia.

12. While on patrol, officers observed a maroon Chevrolet SUV make an illegal U-turn. Officers activated their emergency equipment and conducted a traffic stop. Once the vehicle stopped, officers observed the driver and the front seat passenger making abrupt movements within the vehicle, as if switching seats.

13. The officers approached the vehicle and made contact with the female driver ("UCC-1") and a male front seat passenger. The front passenger was later identified as **CHRISTIAN-JONES**. Officers asked UCC-1 and **CHRISTIAN-JONES** for their identification. UCC-1 provided a Virginia Identification Card to officers and confirmed their current address. **CHRISTIAN-JONES** stated that he did not have his driver's license with him, did not recall his Social Security Number, and falsely claimed he was 17 years old. **CHRISTIAN-JONES** then falsely stated that his name was "Israel Gaskin" and provided a date of birth of October 27, 2006, along with the address of a residence on Overlook Road in Dumfries, Virginia.

14. During the officers' questioning of **CHRISTIAN-JONES**, they observed a dark colored shoulder bag with a blue and red strap on his person.

15. Officers then queried the information provided by UCC-1 and **CHRISTIAN-JONES**. This query revealed that UCC-1 did not have a valid driver's license and that **CHRISTIAN-JONES** did not match the description of "Israel Gaskin," the name **CHRISTIAN-JONES** had falsely provided to officers. In searching the address and date of birth provided by **CHRISTIAN-JONES** on the laptop in the police cruiser, officers located a photograph and physical description of **CHRISTIAN-JONES**, which matched the individual in the front passenger seat of the vehicle. Officers also discovered that **CHRISTIAN-JONES** was not a minor as he had claimed, and that he had outstanding state arrest warrants related to domestic assault and brandishing a firearm.

16. Officers then returned to the vehicle to attempt to detain **CHRISTIAN-JONES** on the outstanding state arrest warrants. Officers asked **CHRISTIAN-JONES** to exit the vehicle and to leave the dark colored shoulder bag in the vehicle. **CHRISTIAN-JONES** then removed the dark colored shoulder bag from his person, placed the bag on the front passenger seat, and exited the vehicle.

17. While exiting the vehicle, **CHRISTIAN-JONES** exhibited nervous and erratic behavior. UCC-1, who appeared to be communicating with someone on her cellphone, told **CHRISTIAN-JONES** that his mother was asking him to calm down and then stated, "Calm down, KJ." I believe "KJ" to be a nickname for **CHRISTIAN-JONES** based on his first and middle name.

18. Officers instructed **CHRISTIAN-JONES** to place his hands behind his back and attempted to arrest him, but **CHRISTIAN-JONES** evaded their attempts and fled on foot with

officers in pursuit. After a foot pursuit, officers eventually apprehended **CHRISTIAN-JONES** after he slipped and fell.

19. A search of **CHRISTIAN-JONES's** person located approximately four hundred four dollars ($404) in U.S. currency in his pants pocket, as well as a Glock 19, 9mm caliber pistol, bearing serial number BXGL473 concealed within the leg of his pants. The pistol was loaded with a round in the chamber and an extended 30-round magazine. The pistol was also equipped with a machinegun conversion device, commonly referred to as an "auto sear" or "switch," which is a device that converts a semi-automatic firearm into a fully automatic firearm. Pictures of the firearm, machinegun conversion device (circled below in red), and extended magazine are depicted below:



*Glock 19 Pistol with Machinegun Conversion Device Recovered from **CHRISTIAN-JONES's** Person*



*30-Round Extended Magazine Recovered from Pistol*

20. As depicted above, the machinegun conversion device was clearly visible at the rear of the Glock 19 pistol's slide and was silver and red in color, in stark contrast to the black in color firearm.

21. After officers advised **CHRISTIAN-JONES** that he was under arrest, he was transported to a local hospital due to injuries he sustained after slipping and falling during his flight from police.

22. After apprehending **CHRISTIAN-JONES**, officers returned to UCC-1 and the vehicle to complete their investigation. Upon questioning, UCC-1 stated that "Israel" was not **CHRISTIAN-JONES's** name and that they knew him by the name "Jojo." UCC-1 stated they were not aware that **CHRISTIAN-JONES** was in possession of a firearm. UCC-1 further stated that **CHRISTIAN-JONES's** last name was "Christian."

23. Officers then explained to UCC-1 that the vehicle would need to be towed as UCC-1 did not have a driver's license and was not authorized to drive the vehicle. UCC-1 asked officers

7

if UCC-1 could remove their "purse" and other belongings from the vehicle. Officers advised UCC-1 that they could remove their belongings. UCC-1 then picked up the dark colored shoulder bag that **CHRISTIAN-JONES** had been carrying before exiting the vehicle.

24.     Officers asked UCC-1 if they could search the "purse" before she removed it from the vehicle to check it for weapons, and UCC-1 consented to the search. Inside the bag, officers discovered approximately $7,645 in U.S. currency, all in 20-dollar denominations and one five-dollar bill, as well as a prescription bottle with the labels removed. Inside the prescription bottle, they located approximately forty-six (46) oblong, white pills with the marking 10/325 on one side and M523 on the other side. In my training and experience, these pills are consistent with 10mg oxycodone pills, commonly referred to by the brand name Percocet. Oxycodone is classified as a Schedule II controlled substance under the Controlled Substances Act and therefore requires a valid prescription.

25.     During a search of the vehicle, officers also located a blue backpack on the front passenger floorboard. Officers searched the backpack and located approximately fifty-six (56) plastic baggies with one baggie containing a pinkish colored powder that was twisted into the corner, as well as a small amount of U.S. currency. Based on my training, experience, and knowledge of this investigation and others, the contents of the backpack are consistent with packaging materials that narcotic distributors use to package narcotics and distribute narcotics. Additionally, in my training and experience, the pinkish colored powder twisted in the corner in one of the baggies is consistent with narcotics distribution. In my training and experience, small baggies twisted in the corner are often used by narcotics distributors to distribute small amounts of narcotics.

26. The suspected narcotics have been transferred to federal custody and will be submitted for laboratory analysis.

27. Officers then questioned UCC-1 regarding the contents of the bag. UCC-1 stated that the bag and its contents belonged to **CHRISTIAN-JONES**. Regarding the pills located inside the bag, UCC-1 stated that UCC-1 did not take any type of "opioids" and did not know what type of pills they were.

28. State investigators ran **CHRISTIAN-JONES's** name through the Virginia Department of Health's Prescription Monitoring Program, a database that tracks prescriptions issued by healthcare providers in the Commonwealth of Virginia. This query revealed that there are no prescription medications in Virginia prescribed to **CHRISTIAN-JONES**.

29. On or about January 28, 2025, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") examined the machinegun conversion device found on the Glock 19 pistol recovered from **CHRISTIAN-JONES's** person and determined that the device, in and of itself, is a combination of parts designed and intended for use in converting a semi-automatic firearm into a "machinegun" as defined by 26 U.S.C. § 5845(b). The unauthorized possession of such devices is prohibited under 18 U.S.C. § 922(o)(1).

30. Based on my training, experience, and knowledge of this investigation and other investigations, I am aware that individuals that engage in the distribution of narcotics possess firearms to protect their narcotics and narcotics proceeds, as well as their own personal safety. Additionally, based on my training, experience, and knowledge of this investigation and other investigations, I am aware that individuals that possess firearms in furtherance of narcotics distribution often modify and/or obtain firearms that have been modified via the installation of an "auto sear," also commonly known as a "switch," to convert semi-automatic firearms into fully

automatic firearms. Further, based on my training and experience, the approximately $7,645 in 20-dollar denominations and one five-dollar bill found inside the same bag as the suspected 10mg oxycodone pills as well as the approximately fifty-six (56) plastic baggies, one of which contained a pinkish colored powder twisted in the corner of the baggie, are consistent with drug distribution and the proceeds of drug distribution.

31. Further, I submit there is probable cause to believe that **CHRISTIAN-JONES** knew that the Glock 19 pistol he carried was equipped with a machinegun conversion device. As part of this investigation, I reviewed electronic evidence obtained pursuant to a federal search warrant authorizing the search and seizure of electronic data from a cellphone seized from **CHRISTIAN-JONES** in September 2022. This review located the following photograph dated on or about July 14, 2022:



*Photograph Recovered from Cellphone Seized from* **CHRISTIAN-JONES**

32.  I believe the individual depicted wearing a black face mask in the above photograph is **CHRISTIAN-JONES** due to his distinctive tattoos displayed in the photograph as well as the fact that the picture was recovered from **CHRISTIAN-JONES's** cellphone. In the photograph, **CHRISTIAN-JONES** is making a hand gesture simulating a firearm, and the photograph has an overlaid graphic of an explosion displayed in the lower right corner. Overlaid over the photograph is the text caption, "Hit his lil' a** with that switch, I bet that switch switch up his nerves." In my training, experience, and knowledge of this and other investigations, I know that the term "switch" is a commonly used slang term that refers to machinegun conversion devices. I further believe that, in the above overlaid caption, **CHRISTIAN-JONES** was referring to shooting at someone with a

11

firearm equipped with a machinegun conversion device. Accordingly, I submit there is probable cause to believe that **CHRISTIAN-JONES** knew both that the firearm he was found in possession of during his arrest described herein was equipped with a machinegun conversion device and what such a device was intended for.

## CONCLUSION

33.     Based on the foregoing, I submit there is probable cause to believe that on or about January 16, 2025, in the Eastern District of Virginia, **CHRISTIAN-JONES** knowingly used or carried a machinegun, namely a Glock 19, 9mm caliber pistol, equipped with a machinegun conversion device, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, possession with intent to distribute a controlled substance in violation of 18 U.S.C. § 841(a)(1), in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Kevin S. Fleenor*
Kevin S. Fleenor
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Crim. Proc. 4.1 on January 29, 2025.

**Lindsey R Vaala** Digitally signed by Lindsey R Vaala
Date: 2025.01.29 10:05:26 -05'00'

Hon. Lindsey R. Vaala
United States Magistrate Judge